George R. WALKER, Mildred C. Marshall, and Royse S. Barnaby, Trustees u/i Joseph R. Walker et al., sometimes known as Walker Building Trust

v.

UNITED STATES of America.

George R. WALKER and Frances B. Walker

v.

UNITED STATES of America.

Civ. A. Nos. 60–140, 60–141.

United States District Court
D. Massachusetts.

May 25, 1961.

Earle W. Carr, Frederick D. Herberich, Gaston, Snow, Motley & Holt, Boston, Mass., for plaintiffs.

Elliot L. Richardson, U. S. Atty., Andrew A. Caffrey, James C. Heigham, Asst. U. S. Attys., Boston, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

Plaintiffs in 60–140–F bring this action as trustees of the so-called Walker Building trust to recover income taxes alleged to have been erroneously assessed and collected for the calendar year 1955. The sole issue is whether the income of the trust was taxable to the beneficiaries thereof or to the trust as a corporation under § 7701(a) (3) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7701 (a) (3). The companion case, 60–141–F, involves questions as to the personal income tax for 1955 of one of the beneficiaries of the trust, which are dependent on the decision in the case involving the taxation of the trust itself.

On October 4, 1893, Joseph Henry Walker transferred certain real estate in Boston to his son Joseph Walker in trust to pay the income to the grantor for life and thereafter to his four children (issue of a deceased child to take their parent's share). On the death of the survivor of said children the trust was to terminate and the principal was to be distributed in equal shares per capita to the then surviving grandchildren. The grantor died in 1907. Of the four children, George Walker died without issue in 1937, Ellen W. Shirk died in 1940 survived by a son, Joseph Walker died in 1941 survived by five children, and Agnes Claflin died in 1949 survived by two children.

There were disputes between members of the family resulting in suits involving this trust, Shirk v. Walker, 298 Mass. 251, 10 N.E.2d 192, 125 A.L.R. 620, and another trust, Walker v. Walker, 326 Mass. 397, 94 N.E.2d 925, and in consequence hostility or at least strained relations existed between various branches of the family.

The trust operated successfully until the early thirties. In 1934 the property was operated at a loss, and the trust was unable to meet the first mortgage falling due in that year. Litigation involving this mortgage resulted in a decree extending the mortgage to 1943 under an arrangement whereby specified amounts of income were to be withheld from the beneficiaries and applied to the principal of the mortgage, the beneficiaries having a charge against trust assets, after the first and second mortgages, for repayment of the amounts so applied. Further extensions on similar terms were made in 1943 and 1946.

Following the death of Joseph Walker in 1941, three trustees were appointed representing the three existing branches of the family. During the next few years there was discussion by the eight surviving grandchildren, to whom the property would presumptively be distributed when the trust terminated on the death of Agnes Claflin. Relations between these parties were such that it was difficult to get them all to agree on anything. The situation was complicated by the existence of two mortgages and the claims for reimbursement of withheld income. They felt immediate sale of the property could be made only at a sacrifice. They also felt it was impractical for the remaindermen to hold title to the property in undivided interests since they were widely scattered geographically in addition to the difficulty of securing agreement among them in any event. Moreover, the bank holding the first mortgage, the latest extension of which would expire in 1949, would not agree to a further extension involving it in dealings with eight owners under these terms. The second mortgage was held by another trust having the same beneficiaries and it was feared that the passing of title directly to the eight beneficiaries would result in merger of the second mortgage into the fee, thus ending the priority of the claims of the owners of the second mortgage over the reimbursement claims. The result of these discussions was a new trust agreement embodied in an instrument dated December 20, 1948, signatures to which were completed in 1949 and which took effect in 1949 upon the termination of the original trust.

By the instrument of December 20, 1948, the eight grandchildren agreed that on the termination of the original Walker

trust, their interests were to continue to be held in trust by the three trustees, one representing each branch of the family, until the death of the survivor of the eight grandchildren. Net income was to be paid to the eight grandchildren in equal shares with provisions governing payment of the share of any of them who died before termination of the trust. There were provisions for appointment of a successor to any trustee who died or resigned, such successor to represent the same branch of the family represented by the trustee he was replacing. Any of the grandchildren could at any time by an instrument in writing bring about termination of the trust and distribution of the trust estate. In any event the trust was to be terminated upon the sale of the Walker Building. There was a spendthrift trust provision under which the interest of a beneficiary could not be alienated except that it might be transferred to another beneficiary or to the trustees. Where a beneficiary elected to sell his interest to the trustees and agreement could not be reached as to the price, the beneficiary could compel sale of the real estate and termination of the trust.

The trustees were given broad powers of management of the real estate, including power to retain unproductive property, power to lease beyond the anticipated life of the trust, power to exchange the real estate for other real estate, power to sell any and all of the real estate held by them in whole or in part, publicly or privately, power to maintain and repair or reconstruct the building, and power to tear down the building and construct new buildings.

The main asset of the trust was the so-called Walker Building consisting of the original building conveyed by the original grantor together with additions erected during the period of the original trust. The active management of the property was carried on by one of the trustees, George R. Walker, who was paid $12,000 a year as compensation for his services. He negotiated leases with the approximately fifty tenants of the building and also carried on negotiations with

banks for refinancing of the mortgage from time to time. A staff of about twenty-five employees was required for operation of the building. Routine activities were performed by Walker alone and important acts performed with the agreement of the remaining trustees. An annual report of the activities and condition of the trust was made to the beneficiaries.

The Walker Building was an old one. In 1949 its operations showed only a slight profit, but this was increased somewhat in subsequent years. The building was heavily taxed, its assessed valuation in 1949 being $1,375,000. Walker's efforts to obtain abatements resulted in a reduction of this valuation to $1,090,000 and later to $950,000. Beginning in 1949 and continuing thereafter Walker talked with various real estate brokers in an effort to procure a customer who would buy the building at a satisfactory price. Finally in 1959 the building was sold for $850,000. The trust was thereupon terminated and its assets have been substantially distributed to the beneficiaries.

The trust, as did the original Walker trust before it, filed its tax returns on a cash, calendar year basis on fiduciary return form 1041 as a revocable trust. The beneficiaries reported their respective shares of its net income as income on their individual returns, whether or not such income was actually distributed to them. In fact, 1955 was the first year in which any substantial portion of the trust income was actually distributed to the beneficiaries.

The sole issue is whether the trust is to be treated for purposes of taxation as a corporation under the provisions of § 7701(a), or whether it is to be treated as a trust whose income is taxable to the grantor-beneficiaries under §§ 671 and 674, 26 U.S.C.A. §§ 671, 674.

The basic criteria for distinguishing between a strict trust of the traditional type and a trust taxable as an association have been clearly laid down in the regulations and in innumerable cases. Each case, however, must be de-

cided on its own peculiar facts and the difficulty lies in determining on the facts of each case considered as a whole on which side of the line the trust in question must fall.

■ Basically an association taxable as a corporation exists when (1) two or more persons associate themselves in a joint enterprise (2) having a substantial resemblance to a corporation and (3) having for its purpose the carrying on of business for a profit.

■ The first of these prerequisites can clearly be found to be present here. Plaintiffs' only contention to the contrary is based on the argument that since the eight grandchildren were divided into hostile family groups, any association which they did form was not voluntary. None of them, however, was under any legal compulsion to enter into the trust agreement. Admittedly it required long negotiations to produce an agreement they would all accept. All agreed in the end because whether or not the arrangement was pleasing to them personally, they were convinced it was the one which would be most advantageous under the circumstances. That is all that the law requires. It does not demand that the association should be a friendly one.

■■ The second requirement is that there should be a substantial resemblance (though not necessarily an identity) of the organization to a corporation. The presence or absence of certain of the outward trappings of a corporation such as officers, directors, minutes, seal, by-laws, shareholders' meetings or certificates of beneficial interest have only secondary significance. The principal criteria as set forth in the leading case of Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 359, 56 S.Ct. 289, 80 L.Ed. 263, are the holding of title by the trustees as a continuing body, centralized management, continuity of the life of the enterprise, means for the transfer of beneficial interests and limitation of personal liability of the participants to property embarked in the undertaking. All of these need not be present in order to make the entity taxable as a corporation. Some may be absent or present only to a limited degree. The extent to which these characteristics are present, however, is the decisive test of whether there is substantial resemblance to a corporation.

Some of these characteristics are clearly present here. There was a continuing body of trustees with centralized management of the enterprise. Transferability of the interests of the beneficiaries was severely limited. Continuity of the life of the trust itself was not assured, since any of the original beneficiaries could at any time have caused the termination of the trust. This factor of lack of continuity has at times been given considerable weight. Thus in Rev.Rul. 54–484, 1954–2 C.B. 242, it is stated:

> "Continuity of life in the corporate sense, a requisite of an association taxable as a corporation, is not practically attained by provisions in a partnership agreement making it possible for the continuing members to continue the partnership if they choose."

Similarly I.T. 3948, 1949–1 C.B. 161 held that a joint operating agreement entered into between co-owners of oil and gas properties would not constitute an association unless "some person or persons are irrevocably authorized to act in a representative capacity for a fixed and determinable period of time to sell the production from the joint operation for the joint account of two or more of the co-owners."[1] Government argues that the power to terminate should be given no consideration because there was no real possibility that it would ever be exercised. In the light of the history of

---

1. Regulations issued under the 1954 Code in 1960, Reg. § 301.7701, not applicable in terms to tax years ending before December 31, 1960, significantly state on this point: "For example, if the agreement expressly provides that the organization can be terminated by the will of any member, it is clear that the organization lacks continuity of life."

the hostile relations which had divided the family groups this argument cannot be accepted. The power to terminate was evidently included as a concession to some of the parties who were persuaded only with difficulty to enter into the agreement in the first place, and an actual exercise of the power, even an unreasonable one, was clearly not an impossible development.

█ The third requirement, and the one of greatest importance, is that the purpose of the trust should be that of engaging in a business for profit. Plaintiffs' contention is that the purpose of the trust here was the orderly liquidation of the trust estate involved. Government's position is that the question must be resolved solely on the basis of the provisions of the trust instrument. It is true, as was said in Sears v. Hassett, 1 Cir., 111 F.2d 961, 962, 963, that "the character of the trust as an association is not determined by the intentions or expectations of its creators, proved by parol, nor by the extent to which the powers in the trust instrument have actually been exercised, but rather by the purposes and potential activities as disclosed on the face of the trust instrument." Government argues that the extent of the powers conferred on the trustees, the emphasis on the desirability of the continuation of centralized management, the absence of any express statement that the purpose of the trust was liquidation, and the failure to include any express requirement for the sale of the property and the termination of the trust within any specified time all show clearly that the purpose was not liquidation but continued operation for profit.

The trust instrument must be considered as a whole. If it does not expressly state that the purpose of the trust is liquidation, it at least clearly implies it. In the circumstances in which the earlier trust was coming to an end, a satisfactory liquidation of the property could be expected to require considerable time. The trust property consisted of a large and complex real property whose conservation required extensive management during the liquidation period. In this light the extensive powers of management conferred upon the trustees appear to be given as incidental to the orderly liquidation of the property and not for an independent business motive. In fact, the trust instrument expressly states in Article VI that, "The Trustees are not given extraordinary powers relating to the management, investment and reinvestment of intangible securities and other personal property, except mortgages for the reason that this Agreement and Indenture of Trust will have terminated upon the occasion of a liquidation of said real estate known as the Walker Building and of any purchase money mortgages resulting from the sale, thereof, all in the manner hereinabove set forth." The provisions for termination of the trust upon liquidation of the real estate and for early termination by any of the interested parties are further indications of a purpose of liquidation rather than of conducting a business for profit. The provisions of the trust instrument considered as a whole thus indicate that the paramount purpose of the arrangement was an orderly and timely liquidation of the estate.

The evidence of plaintiff Walker was that liquidation was in fact the object of the agreement. The attendant circumstances bear this out. In 1949 immediate sale of the real estate or distribution in kind to the beneficiaries involved genuine difficulties and prospects of financial loss. An arrangement for orderly liquidation was necessary and the continuation of the existing trust arrangement was clearly a reasonable choice of an orderly method of liquidation. The conduct of the trustees after 1949 showed reasonable and continuing efforts to improve the salability of the property and to dispose of it as soon as a reasonably adequate price could be obtained.

█ As was pointed out in the Morrissey case, supra, every trust involves some business activity. There was undoubtedly considerable business activity on the part of the trustees in this case, but it does not appear to have involved

more than what was required to conserve the value of the property and obtain a satisfactory price for it. The law does not require that a liquidation be carried out immediately under unfavorable circumstances and at the cost of selling at a loss. Nor does it require that the property be operated at a loss pending disposition of it. Where the paramount purpose of the arrangement is liquidation, the use of reasonable business skill and judgment in waiting for a favorable opportunity for sale and in managing the property efficiently in the meantime to enhance its salability does not convert the liquidation into a business enterprise. Helvering v. Washburn, 8 Cir., 99 F.2d 478, 481; Paine v. United States, D. C., 32 F.Supp. 672; Pitzman, 36 B.T.A. 81; Girard Trust Co., 34 B.T.A. 1066; Broadway-Brompton, 34 B.T.A. 1089.

The conclusion must be that the trust here involved was an entity with some but not all the characteristics of a corporation, that it had as its paramount purpose the orderly liquidation of the trust estate and not the carrying on of a business for profit, that the business activities carried on were only those incidental to the conservation of the property and its orderly liquidation, and that it is therefore for purposes of the federal income tax not an association taxable as a corporation within the meaning of § 7701(a) (3) but a revocable trust falling within the provisions of §§ 671 and 676, 26 U.S.C.A. §§ 671, 676. Cf. Codman v. United States, D.C., 30 F.Supp. 732; Paine v. United States, D.C., 32 F.Supp. 672.

Plaintiffs in No. 60–141–F have paid their individual income tax on the basis that income of the trust in No. 60–140–F was taxable to the grantor-beneficiaries and bring their action only for a refund which they contend would be due if the holding in 60–140–F was that the trust was taxable as a corporation. Consequently they concede that in the light of the holding in 60–140–F, 60–141–F is to be dismissed.

In No. 60–140–F judgment will be entered for plaintiffs, the computation of the amount of the judgment to be agreed upon by the parties. In No. 60–141–F judgment will be entered for defendant dismissing the complaint.